## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| Lucius R., | |
| Plaintiff, | Civil No. 3:22-cv-01312-MPS |
| v. | |
| Martin O'Malley,[1] Commissioner of Social Security, | January 22, 2024 |
| Defendant. | |

## RECOMMENDED RULING ON PENDING MOTIONS

The Plaintiff, Lucius R.,[2] appeals the decision of the Commissioner of Social Security

("Commissioner" or "Defendant"), rejecting his application for Disability Insurance ("DI") and

Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act,

respectively. (Compl., ECF No. 1.) He has moved for an order "reversing the . . . decision . . .

and remanding the cause for the calculation of benefits[,]" or in the alternative, for an order

"remanding the matter to the Commissioner for a *de novo* hearing, a new Decision and Order in

accordance with law, and approving an award of attorney's fees under the Equal Access to Justice

Act." (ECF No. 20-2, at 24-25.) The Commissioner has moved for an order affirming the decision.

(ECF No. 21.) Chief United States District Judge Michael P. Shea referred the case to me, United

---

[1]     When he filed his complaint, the Plaintiff named the then-acting Commissioner of Social Security, Kilolo Kijakazi, as the defendant. (ECF No. 1, at 1.) Since then, President Biden nominated and the Senate confirmed Martin O'Malley as the Commissioner. Commissioner O'Malley is automatically substituted as the defendant pursuant to Fed. R. Civ. P. 25(d). The Clerk of the Court is respectfully directed to amend the caption of the case accordingly.

[2]     Pursuant to the Court's January 8, 2021 Standing Order, the Plaintiff will be identified solely by first name and last initial, or as "the Plaintiff," throughout this opinion. *See* Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

States Magistrate Judge Thomas O. Farrish, "for all purposes including issuing a Recommended Ruling" on dispositive motions. (ECF No. 13.)

The Plaintiff claims that the Administrative Law Judge ("ALJ") made five principal errors in deciding his case. First, he asserts that "the administrative record was not developed." (ECF No. 20-2, at 1-10.) Second, he argues that the ALJ erred at Step Two of the five-step sequential evaluation process in failing to recognize his fibromyalgia as a medically determinable impairment. (*Id.* at 11-13.) Third, he says that the ALJ committed an error at Step Four in finding that he could perform his past job as a case manager "not as . . . actually performed," but "as generally performed" (*id.* at 13-20), and fourth, he argues that the ALJ also erred at Step Five in accepting facially implausible testimony from a vocational expert about the number of jobs available in the national economy. (*Id.* at 21.) Fifth and finally, he says that the ALJ deprived him of a fair hearing by cutting off his testimony. (*Id.* at 21-24.) The Commissioner disagrees with each of these contentions, and he argues that the ALJ's decision was free of legal error and supported by substantial evidence at every step. (*See generally* ECF No. 21-1.)

For the reasons set forth below, I agree with the Plaintiff on his second claim. Although the ALJ's opinion was generally thorough and detailed, his analysis of the medical determinability of the Plaintiff's fibromyalgia did not properly follow the relevant Social Security Ruling and was unsupported by substantial evidence. (*See* discussion, Section III.A *infra.*) And although many Step Two errors are deemed harmless if the ALJ identifies other, severe impairments and proceeds to the later steps, that principle does not apply to a determination that an impairment is not medically determinable. *See, e.g., Keller v. Colvin*, No. 16-cv-6399P, 2017 WL 4112024, at *14 (W.D.N.Y. Sept. 18, 2017) (citing cases).

I therefore recommend that the Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 20) be granted in part and denied in part.  It should be granted to the extent that it seeks an order remanding the case to the Commissioner for a new hearing but denied to the extent that it seeks reversal and remand solely for a calculation and award of benefits.  The latter form of relief is proper only when the record contains "persuasive proof" of the claimant's disability and "a remand for further evidentiary proceedings would serve no purpose."  *Parker v. Harris*, 626 F. 2d 225, 235 (2d Cir. 1980).  That is not the case here.  (*See* discussion, Section V *infra*.)  I also recommend that the Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 21) be denied.

The Plaintiff makes other claims of error.  (ECF No. 20-2, at 1-10, 13-25.)  The foregoing recommended disposition, if adopted, would result in a rehearing, and thus have the practical effect of mooting those other claims.  I will nonetheless address some of them in Section III.B below, for the guidance of the parties and the ALJ on remand and for the assistance of the District Judge.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiff is a forty-eight-year-old man who has been diagnosed with Ehlers-Danlos syndrome ("EDS") and fibromyalgia, among other ailments.  (R. 976-77.)  EDS "is a group of inherited disorders that affect [a sufferer's] connective tissues."  Mayo Clinic, *Diseases and Conditions: Ehlers-Danlos Syndrome*, https://www.mayoclinic.org/diseases-conditions/ehlers-danlos-syndrome/symptoms-causes/syc-20362125 (last visited Jan. 21, 2024).  "People who have Ehlers-Danlos syndrome usually have overly flexible joints and stretchy, fragile skin."  *Id.* Fibromyalgia, by contrast, "is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues."  Mayo Clinic, *Fibromyalgia Overview*, https://www.mayoclinic.org/diseases-conditions/fibromyalgia/symptoms-causes/syc-20354780

(last visited Jan. 21, 2024).  "Many people who have fibromyalgia also have tension headaches, temporomandibular joint (TMJ) disorders, irritable bowel syndrome, anxiety and depression."  *Id.*

The Plaintiff holds a master's degree in social work from the University of Connecticut (R. 2530), and he used to work in the social services field.  From 2003 to 2005 he worked as a career development program assistant, and from 2005 to 2006 he worked as a case advocate for the homeless.  (R. 329.)  In 2006 and 2007 he worked as a case manager for a different social services organization, and in 2008 and 2009 he was employed as a grant consultant for a community agency.  (*Id.*)  He also earned money walking dogs.  (*Id.*)  He says that he stopped working on December 31, 2017 (R. 327), although he has done some work below the level of "substantial gainful employment" since then, as will be discussed below.

The Plaintiff has been complaining of chronic pain since at least 2009.  (R. 2178.)  He was then under the care of the UConn Medical Group, and his doctors' attention focused on a disc herniation that he had experienced in 2007.  (*Id.*)  By 2014 he had switched to Yale New Haven Primary Care, and his Yale doctors began to note that his disc herniation and protrusions were unaccompanied by any reports of trauma or strain.  (R. 437.)  They also noted his long history of "joint hypermobility/instability with multiple dislocations/subluxations without significant traumatic trigger."  (R. 437.)  "Concern[ed] for connective tissue disorder," and specifically noting the genetic disorders of Marfan's syndrome and EDS as potential causes of his symptoms, they referred him to a genetics clinic.  (*Id.*)

The geneticists' efforts proved "unrevealing" (R. 1043), and the Plaintiff began treating with a Yale rheumatologist, Dr. Fotios Koumpouras, in February of 2016.  (R. 1045-50.)  After conducting a physical exam, Dr. Koumpouras assessed the Plaintiff's case as a "curious" one.  (R. 1050.)  At this initial visit he "suspect[ed] . . . multi site degenerative arthritis overlaid with

fibromyalgia," but he also noted the possibility of "non radiographic ankylosing spondylitis." (*Id.*) The Plaintiff treated with Dr. Koumpouras on several other occasions, and ultimately the doctor diagnosed him with both EDS and fibromyalgia. (R. 1005, 976, 1333, 1335.)

The Plaintiff applied for DI and SSI benefits on March 28, 2018. (R. 58.) When asked to list all physical or mental conditions that limited his ability to work, the first condition he listed was EDS of the "hypermobile type." (R. 327.) He also listed "hypermobility in joints and spine"; "extreme chronic pain in" his wrist, shoulders, hips, and neck; "continual spasms tremors numbness and locking up of muscles"; and "muscle weakness." (*Id.*) He added that his ability to work was additionally limited by "intervertebral and thoracolumbar disc degeneration," "spinal stenosis in [the] cervical region," "osteopartritis [sic] throughout [his] joints and back," "subluxation of joints," and "hypermobility syndrome." (*Id.*) He also listed fibromyalgia as a limiting condition. (*Id.*) He alleged a disability onset date of September 30, 2008. (*See* R. 328.)

After receiving the Plaintiff's application, the Social Security Administration ("SSA" or "Administration") obtained his medical records from Yale New Haven Health, Gaylord Hospital, and elsewhere. (R. 92-94.) It also obtained a consultative examination report from Dr. Joseph Guarnaccia and APRN Patricia Garrett. (R. 1824-28.) Additionally, the SSA had his case reviewed by a non-examining state agency consultant, Dr. Joseph Connolly. (R. 83, 101.) After reviewing these materials, the SSA denied the Plaintiff's DI claim because the record evidence was "not sufficient to fully evaluate [his] claim" as of his date last insured ("DLI"), September 30, 2013. (R. 88.) The SSA also denied his SSI claim because, although it conceded that his "condition results in some limitations in [his] ability to perform work related activities," it had nevertheless "determined that [his] condition is not severe enough to keep [him] from working." (R. 103.)

The Plaintiff requested reconsideration, and the SSA had his file reviewed by another non-examining consultant, Dr. William Rutherford, Jr.  (R. 133.)  After reconsideration review, the SSA reaffirmed its denial of the DI claim on the ground that "[t]he evidence in file is not sufficient to fully evaluate [the] claim" as of the DLI.  (R. 135.)  The Administration also denied the Plaintiff's SSI claim, again on the ground that his "condition is not severe enough to keep [him] from working."  (R. 120.)  About six weeks after receiving these decisions, the Plaintiff requested a hearing before an ALJ.  (R. 184) (reflecting request for hearing on December 14, 2018).

ALJ Ronald Thomas held an initial hearing on January 13, 2020.  (R. 2.)   The Plaintiff's counsel, Attorney Benjamin Shapiro, appeared on his behalf.  (*Id.*)  After admitting all the exhibits into the record, the ALJ examined the Plaintiff for half an hour.  (*See* R. 24) (noting, at beginning of attorney's examination, that "we've been on the record for half an hour already").  The Plaintiff stood up and performed stretching exercises throughout his testimony, assertedly because of discomfort caused by the hypermobility of his spine.  (R. 24-25.)  After the ALJ completed his examination, he passed the witness to Attorney Shapiro, who asked questions without interruption until he had "nothing further."  (R. 24-31.)

The ALJ then examined a vocational expert ("VE"), Pat Green, and allowed Plaintiff's counsel to examine the expert as well.  (R. 31-41.)  After Attorney Shapiro stated that he had "nothing further" for VE Green, the ALJ asked if there were any reports missing from the record.  (R. 41.)  Counsel initially stated that some might indeed be missing, but that he nevertheless thought the Plaintiff had made "a strong enough presentation that I think we can establish disability without the need to get those."  (R. 41-42.)  Yet after being reminded by the ALJ of the SSA's "duty to obtain all the medical records," Attorney Shapiro explained that he had been thinking of

another case, and that the record was indeed complete in this one.  (R. 42.)  The ALJ then closed the hearing after fifty-three total minutes.  (R. 4, 43.)

About six weeks later, the ALJ issued an unfavorable decision.  (R. 55.)  As will be explained below, ALJs must follow a five-step process in deciding disability claims, and ALJ Thomas's decision followed that format.  At Step One, he held that the Plaintiff had "not engaged in substantial gainful activity since September 30, 2008."  (R. 60.)  At Step Two, he concluded that the Plaintiff suffered from the severe impairments of EDS, osteoarthritis, and degenerative disc disease of the cervical, lumbar, and thoracic spines.  (*Id.*)  Proceeding to Step Three, the ALJ held that the Plaintiff's impairments did not meet or medically equal the severity of any of the "Listings" – that is, the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 61.) He then concluded that the Plaintiff had the residual functional capacity ("RFC") to perform "sedentary work" with additional limitations (R. 62), and he used that RFC to hold at Step Four that the Plaintiff was "capable of performing [his] past relevant work as a case manager and counselor."  (R. 68.)  He nonetheless proceeded to Step Five and found that there were other jobs in the national economy that the Plaintiff could perform, including "ticket checker," "order clerk," and "sorter." (R. 69.)  He summed up by holding that the Plaintiff had "not been under a disability, as defined in the Social Security Act, from September 30, 2008 through" February 28, 2020.  (R. 70.)

The Plaintiff then requested review by the Appeals Council (R. 270-72), and when the Council upheld the decision (R. 44), he appealed to this court.  (R. 2333; *see also* Compl., ECF No. 1, No. 3:20-cv-1488 (SRU) (D. Conn.).)  After filing the administrative record, however, the Commissioner changed course and consented to the entry of an order remanding the case for further administrative proceedings.  (Consent Mot. for Remand, ECF No. 20, No. 3:20-cv-1488

(SRU) (D. Conn.).)  The Appeals Council then returned the case to the ALJ on September 4, 2021.
(R. 2341-43.)  Observing that the ALJ had applied an improper mix of old and new regulations
when assessing the opinion evidence, the Appeals Council instructed him to, among other things,
"[g]ive further consideration to all opinion evidence, pursuant to the provisions of" the new
regulations at 20 C.F.R. §§ 404.1520c and -416.920c.  (R. 2341-42.)

The ALJ held another hearing on December 7, 2021.  (R. 2296.)  Attorney Shapiro again
appeared for the Plaintiff.  (*Id.*)  The ALJ began another examination, asking questions about such
things as the Plaintiff's work history and lifting limitations.  (R. 2300-03.)  After five transcript
pages' worth of testimony, Attorney Shapiro observed that the Plaintiff was "grimacing in pain"
and "[kept] stretching," "[kept] massaging parts of" himself.  (R. 2303.)  The Plaintiff explained
that his "hyper mobile disorder" was "very fickle," and that he was "in a very bad spasm phase"
that day.  (R. 2304.)  The ALJ observed that the quality of the hearing might be improved if the
Plaintiff was not distracted by his condition, and he suggested rescheduling to another day when
the Plaintiff was feeling better.  (*See id.*)  Attorney Shapiro agreed, and the ALJ stated that he
would not put the case back "in the normal rotation" but would instead "put it back in as soon as
we can."  (*Id.*)  The hearing closed after thirty-one minutes.  (R. 2298, 2305.)

The ALJ then held a third hearing on March 11, 2022, and Attorney Shapiro appeared for
the Plaintiff yet again.  (R. 2258.)  The ALJ began his examination by asking the Plaintiff about
his education and work history, including his part-time work as a dog walker and his past work as
a case manager.  (R. 2261-63.)  During this portion of the examination the Plaintiff asked for a
break to stretch, which the ALJ allowed; but when Attorney Shapiro interrupted and asked the
Plaintiff to testify about the stretches he was doing and why he needed to do them, the ALJ told
him to wait his turn.  (R. 2265.)  Returning to his examination, the ALJ asked the Plaintiff about

his physical impairments and limitations.  (R. 2265-75.)  He asked about fibromyalgia in particular, and the Plaintiff explained that it "is kind of a secondary diagnosis . . . caused by hyper mobility and the consequences of hyper mobility, vertebra and joints."  (R. 2269.)  The ALJ then asked about the stretching that the Plaintiff had done during his hearings, and the Plaintiff responded that he stretched to manage spasms, radial tension, and tremors.  (R. 2270.)  After some additional questions about travels and other activities, the ALJ allowed the Plaintiff's counsel to examine him.  (R. 2275.)

Attorney Shapiro began by asking the Plaintiff more questions about his need to stretch, and about his stretching regimen.  (R. 2275-77.)  He then asked several questions about the braces that the Plaintiff wore on his hands, and other questions about joint dislocations that he had suffered because of his EDS.  (R. 2277-81.)  After one particularly lengthy answer, the ALJ advised Attorney Shapiro that "we have got about a minute left please."  (R. 2281.)  Counsel protested that he did not know if he could ask everything he needed to ask in a minute, but the ALJ responded that "[w]e are not going to go over every detail as you know for treatment care.  We have 31 exhibits already to look at."  (*Id.*)  Attorney Shapiro asked several questions about the Plaintiff's shoulder massage regimen, after which the ALJ instructed, "[l]ast question."  (R. 2282.)  Counsel then ended his examination with one final question about the difficulties the Plaintiff experienced in using keyboards.  (R. 2282-83.)

Before moving to the VE portion of the hearing, Attorney Shapiro protested that the ALJ's "last question" instruction had prevented him from "ask[ing] questions about days when [the Plaintiff] is immobilized and unable to get out of bed."  (R. 2284.)  The ALJ responded that Attorney Shapiro could "give us a note on that."  (*Id.*)  He explained that, while there may be "some judges that let you spend all day with a hearing and go over every detail," he could not

"afford to stay here all day." (*Id.*)  He added that the Plaintiff gave "on average 50-to-100 word answers to every question," and he reiterated that any gaps in testimony could be addressed with "a note . . . after the hearing." (*Id.*)

The ALJ then took testimony from a new VE, Ruth Baruch.  (R. 2284-93.)  He asked VE Baruch whether "an individual of the claimant's age, education and past relevant work experience who is limited to the sedentary exertion level," and who is further limited by the need to avoid certain hazards and by limitations on bending, lifting, handling, fingering, and so forth, "could perform . . . their past relevant work." (R. 2287.)  The Plaintiff had testified that in one past "case manager" job, his employer had required him to lift "close to 50" pounds.  (R. 2263-64.)  VE Baruch therefore responded that the ALJ's hypothetical person could not perform the job of case manager as the Plaintiff had described it in his testimony, but could perform it "as per" the Dictionary of Occupational Titles ("DOT"), ostensibly because the relevant DOT definition does not contemplate such a lifting requirement.  (R. 2286-87.)  The VE also testified that such a person could perform "[o]ther jobs at the sedentary level," including "document preparer," "ticket checker," and "eyeglass polisher."  (R. 2288.)  She added that there were 27,850 such jobs available in the national economy.  (*Id.*)  Attorney Shapiro then examined her for three transcript pages, without interruption from the ALJ.  (R. 2290-93.)

The hearing closed with the ALJ observing that the Plaintiff had testified to the existence of a rheumatology note that was not in the exhibits, and agreeing to hold the record open for thirty days so the notes from that visit could be obtained.  (R. 2293-94.)  The hearing ended after one hour and eight minutes.  (R. 2260, 2295.)  Between his three hearings, the Plaintiff had a total of two hours and thirty-two minutes of hearing time before the ALJ.  (R. 4, 43; 2298, 2305; 2260, 2295.)

Later that day, Attorney Shapiro submitted the note that the ALJ had invited.  (R. 2522.)
He stated that the ALJ's "last question" instruction had deprived him of "an opportunity to inquire
about topics including but not limited to claimant's headaches, his dog walking activity, and about
days (and parts of days) when he is bedbound."  (*Id.*)  He added that he had "intended to inquire
about these as part of [his] representation."  (*Id.*)

The ALJ then issued a second, unfavorable decision on June 22, 2022.  (R. 2225.)  Like
the first opinion, the second opinion tracked the five-step sequential evaluation process.  (R. 2225-
47.)  At Step One, the ALJ noted that the Plaintiff was still earning money as a dog walker, and
that he had "engag[ed] in part-time grant writing in 2014 and 2021."  (R. 2229.)  He nonetheless
concluded that the Plaintiff had "not engaged in substantial gainful activity since September 30,
2008" because his earnings were under the relevant monetary threshold.  (*Id.*)  He stated, however,
that he would "consider[] the claimant's work after the onset date when discussing his symptoms
and alleged functional limitations."  (*Id.*)

At Step Two, the ALJ held that the Plaintiff suffered from the severe impairments of EDS,
osteoarthritis, and degenerative disc disease.  (*Id.*)  He concluded that, "[b]ased on the evidence of
record," these three conditions "significantly limit[ed] the claimant's ability to perform basic work
activities."  (R. 2229-30.)  Moreover, he disagreed with Dr. Connolly to the extent that the doctor
had suggested that the pre-DLI severity of the Plaintiff's impairments could not be assessed.  (R.
2230.)  Whereas Dr. Connolly had said that the record evidence was "not sufficient," the ALJ
noted that "[t]he record . . . shows that the claimant reported a longstanding history of joint
hypermobility and pain, occurring prior to the date last insured."  (*Id.*)  Disagreeing with Dr.
Connolly in the Plaintiff's favor, the ALJ stated that "the overall evidence of record supports that
the claimant has medically determinable joint and spinal issues that caused more than minimal

11

functional limitations in his ability to perform work-related activities, prior to the date last insured." (*Id.*)

The ALJ also considered the Plaintiff's fibromyalgia at Step Two, but he held that it was not "a medically determinable impairment in this claim." (*Id.*) He acknowledged that the Plaintiff had been diagnosed with fibromyalgia by his rheumatologist, Dr. Koumpouras. (*Id.*) (citing R. 976, 1340). But he noted that "[a] diagnosis alone is insufficient," because "[t]he evidence must also establish that the criteria for a diagnosis of [fibromyalgia] are met and are documented in the record." (*Id.*; *see also* discussion, Section III.A *infra.*) He then considered the two sets of diagnostic criteria referenced in Social Security Ruling ("SSR") 12-2p – the "1990 American College of Rheumatologists (ACR) Preliminary Diagnostic Criteria" and the "2010 ACR Preliminary Diagnostic Criteria." (R. 2230) (citing SSR 12-2p, 2012 WL 3104869) (hereinafter "SSR 12-2p"). He concluded that the 1990 criteria had not been satisfied because, among other reasons, the Plaintiff "lacked the classic [fibromyalgia] trigger points on examination." (R. 2231.) And he held that the 2010 criteria had not been met because the record did not contain "evidence of repeated manifestations of six or more [fibromyalgia] signs, symptoms or co-occurring conditions." (*Id.*) Concluding that "the evidence does not establish that [*sic*] criteria for a diagnosis of" fibromyalgia, he held that "fibromyalgia is not a medically determinable impairment in this claim." (*Id.*) (citing SSR 12-2p).

Turning to Step Three, the ALJ held that the Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of" any Listing. (R. 2231.) He considered "Listing 1.15 for disorders of the skeletal spine resulting in the compromise of a nerve root," and "Listing 1.18 for abnormality of a major joint or extremity," but found them unsatisfied because (among other reasons) the Plaintiff did not require a walker or wheelchair and

could use both upper extremities for work-related activities. (*Id.*) He next considered "Listing 14.06 for undifferentiated and mixed connective tissue disease," but likewise found it unmet because the Plaintiff did "not have involvement of two or more organs/body systems" with other required features. (R. 2232.) Finally, he addressed "Listing 14.09 for inflammatory arthritis," but concluded that it was not met because "[t]here is no evidence of persistent inflammation or persistent deformity of one or more major peripheral weight-bearing joints resulting in an inability to ambulate effectively." (*Id.*)

The ALJ then assessed the Plaintiff with a highly restrictive RFC. He found that the Plaintiff had the capacity to perform only "sedentary work," which the SSA regulations define as work that "involves lifting no more than 10 pounds at a time" and only "occasionally lifting or carrying articles like docket files, ledgers, and small tools." (R. 2232); 20 C.F.R. §§ 404.1567(a), -416.967(a). He further concluded that the Plaintiff could only "occasionally twist, squat, bend, balance, kneel, crawl, and climb." (R. 2232.) And while the ALJ found that the Plaintiff could drive a car for personal use, he also concluded that he "must not climb ladders, ropes or scaffolds and [must] avoid hazards such as heights, vibrations and dangerous machinery." (*Id.*) He added that the Plaintiff could "frequently handle and finger bilaterally." (*Id.*)

The ALJ's opinion contained an unusually detailed, eleven-and-a-half page discussion of the bases for his RFC findings. After briefly reviewing the Plaintiff's testimony about his limitations, the ALJ spent nearly seven pages discussing medical records going back to 2009. (R. 2233-39.) He noted records that were ostensibly supportive of disability; for example, he discussed a 2014 report of an "unprovoked cervical disc herniation resulting in bilateral hand numbness, joint instability, and joint pain," and a 2021 diagnosis of "symptomatic EDS" with "cervical stenosis and degenerative changes." (R. 2234, 2237.) But he also discussed those

records that were less supportive, including numerous notes documenting "4-5/5 extremity strength, normal ranges of spinal and joint motion, normal reflexes, no extremity edema, and intact extremity sensations at examinations." (R. 2238.) He then spent five-and-a-half pages discussing the available opinion evidence, as will be discussed further below. (R. 2239-44.)

At Step Four of the five-step process, the ALJ used the RFC to find that the Plaintiff was "capable of performing [his] past relevant work as a case manager." (R. 2244.) VE Baruch had equated the job of "case manager" with the DOT title for "social worker," and she testified that the job as defined by the DOT calls for only a sedentary level of exertion. (*Id.*; *see also* R. 2286.) The ALJ accepted the Plaintiff's testimony that his particular employers had required higher levels of exertion, even if the DOT definition would have suggested otherwise. (R. 2244-45.) But in the ALJ's view, the question at Step Four was whether the Plaintiff could "perform the position as generally performed," not as required by the occasional outlier employer. (*See* R. 2245.) The ALJ therefore held that the Plaintiff "is able to perform the position as generally performed," because the job of "case manager" generally "does not require the performance of . . . any of the exertional or nonexertional limitations precluded by his residual functional capacity." (*Id.*)

Although the ALJ reached this conclusion at Step Four, he nonetheless proceeded to Step Five and concluded that "there are other jobs that exist in significant numbers in the national economy that the claimant can also perform." (R. 2245.) He disagreed with VE Baruch in the Plaintiff's favor with respect to the job of "ticket checker," because "per the DOT, the position requires constant handling and fingering, whereas the RFC provides for only frequent handling and fingering bilaterally." (R. 2246, at n.4.) But he accepted the VE's testimony that a person with the Plaintiff's limitations could perform the "document preparer" and "eyeglass polisher" jobs, and he further accepted that those jobs exist in sufficient numbers in the national economy.

(R. 2246.)  Taking all five steps together, the ALJ held that "[t]he claimant has not been under a disability, as defined in the Social Security Act, from September 30, 2008, through" June 22, 2022. (*Id.*)

Bypassing the Appeals Council,[3] the Plaintiff appealed ALJ Thomas's decision to this court.  (Compl., ECF No. 1.)  Shortly after he did so, Judge Shea referred the case to me "for all purposes including issuing a Recommended Ruling" on any dispositive motions.  (ECF No. 13.) The Commissioner subsequently answered the complaint by filing a certified copy of the 2,992-page administrative record.  (ECF No. 15; *see also* D. Conn. Standing Scheduling Order for Social Security Cases, ECF No. 5, at 2 (stating that the Commissioner's filing of the administrative record is "deemed an Answer (general denial) to Plaintiff's Complaint").)  The Plaintiff then filed his motion for an order reversing or remanding the Commissioner's decision (ECF No. 20), supported by a twenty-five page brief citing ninety-six cases (ECF No. 20-2), and by a thirty-one page statement of material facts.  (ECF No. 20-1.)  The Commissioner replied with a motion to affirm (ECF No. 21), also supported by a substantial brief and statement of facts.  (ECF Nos. 21-1, 21-2.)  The Plaintiff  did not file a reply brief, and his time for doing so has expired.  The parties' motions are therefore ripe for decision.

---

[3]     Ordinarily a plaintiff must appeal an adverse decision of an SSA ALJ to the Appeals Council, and if she does not, the federal courts lack jurisdiction over her claim.  *See* 42 U.S.C. § 405(g) (providing that a claimant may appeal to the federal court only when there has been a "final decision of the Commissioner of Social Security after a hearing to which he was a party"); *Sims v. Apfel*, 530 U.S. 103, 107 (2000) ("If a claimant fails to request review from the [Appeals] Council, there is no final decision and, as a result, no judicial review in most cases.").  But there is an exception to this principle where, as here, "a case is remanded by a Federal court for further consideration and the Appeals Council remands the case to an" ALJ.  20 C.F.R. §§ 404.984(a), - 416.1484(a).  In that situation, the ALJ's remand decision "will become the final decision of the Commissioner . . . unless the Appeals Council assumes jurisdiction of the case" on its own motion. *Id.*; *see also Lax v. Astrue*, 489 F.3d 1080, 1082 (10th Cir. 2007) ("Because the Appeals Council remanded Lax's case to an ALJ after the federal court's initial remand, the ALJ's decision stands as the final decision of the Commissioner for purposes of our review.").

## II.    APPLICABLE LEGAL PRINCIPLES

To be considered disabled under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.'" *Smith v. Berryhill*, 740 F. App'x 721, 722 (2d Cir. 2018) (summary order) (quoting 20 C.F.R. § 404.1505(a)); *see also* 20 C.F.R. § 416.905(a).  As noted above, SSA ALJs follow a familiar five-step evaluation process in determining whether a claimant is disabled.

At Step One, the ALJ determines "whether the claimant is currently engaged in substantial gainful activity." *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)).  To be found non-disabled at this step, the claimant must be performing work that is "both substantial and gainful," with "substantial" defined in the SSA regulations as "work activity that involves doing significant physical or mental activities," and "gainful" defined as work done "for pay or profit."  20 C.F.R. §§ 404.1572, -416.972.  The regulations add that if the claimant's average monthly earnings fall below a specified threshold, the SSA will regard him as "not engaged in substantial gainful activity" even if he does some work. 20 C.F.R. §§ 404.1574, -416.974.  Thus, a claimant can do some work – and earn a small amount of money – and still not be disqualified at this step.  *See, e.g., Jose G. v. Kijakazi*, No. 3:21-cv-1434 (TOF), 2022 WL 3593702, at *1 (D. Conn. Aug. 23, 2022).  But an "ALJ may consider a claimant's past work" in assessing disability at the later steps of the process, "even if the earnings from that work fall below the guidelines." *Parker v. Astrue*, No. 1:06-cv-1458 (GLS/VEB), 2009 WL 3334341, at *3 (N.D.N.Y. Oct. 14, 2009).

At Step Two, the ALJ considers the claimant's "medically determinable impairments" and analyzes whether one or more are "severe." *McIntyre*, 758 F.3d at 150. A "medically determinable impairment" is one that results from "anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1521, -416.921. "If an impairment is not medically determinable, then it cannot be 'severe' at step two." *Cooper v. Comm'r of Soc. Sec.*, No. 17-cv-1058 (MJR), 2019 WL 1109573, at *4 (W.D.N.Y. Mar. 11, 2019) (citing *Keller*, 2017 WL 4112024, at *12). Special rules apply to the medical determinability of fibromyalgia, as will be discussed below. (*See* discussion, Section III.A *infra*.)

While the regulations governing Step Two do not contain an express definition of "severe," they do define "non-severe impairment[s]," and thus they define severity by negative implication. *Larkin v. Astrue*, No. 3:12-cv-0035 (WIG), 2013 WL 4647243, at *5 (D. Conn. Apr. 29, 2013), *report and recommendation adopted in part, rejected in part on other grounds,* No. 3:12-cv-35 (MPS), 2013 WL 4647229 (D. Conn. Aug. 29, 2013). "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1522(a), -416.922(a); *see also* SSR 96–3p, 1996 WL 374181, at *1 (S.S.A. July 2, 1996). Impairments that are "not severe" must be only a slight abnormality that has no more than a minimal effect on an individual's ability to perform basic work activities. *Id.* at *1. Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1522(b), -416.922(b).

At Step Three, the ALJ evaluates whether the claimant's impairment "meets or equals the severity" of one of the "Listings." *McIntyre*, 758 F.3d at 150. At that step, the ALJ considers the severity of the impairment, without regard to vocational factors. *See* 20 C.F.R. §§ 404.1525(a), -416.925(a) (describing Listings as "impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience"). "A claimant who satisfies a Listing at Step Three is entitled to benefits, and the evaluation of his claim ends there." *Kujtim M. v. Kijakazi*, No. 3:21-cv-205 (TOF), 2022 WL 2965621, at *3 (D. Conn. July 27, 2022). Listed impairments are purposefully set at a high level of severity because "the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). When a claimant meets or equals a Listing, "he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work." *Id.; see also Petrie v. Astrue,* 412 F. App'x 401, 404 (2d Cir. 2011) (summary order) (observing that Step Three is "based solely on medical evidence," and if the claimant meets his burden he is "*per se* 'disabled' and thus presumptively qualified for benefits"). Listed impairments set such strict standards because they essentially end the five-step inquiry, before residual functional capacity is even considered. *See Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) ("[S]tep three streamlines the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background.").

If the claimant is not found disabled at Step Three, the ALJ then assesses his RFC and uses that assessment at Step Four to determine whether he can perform any of his "past relevant work." A claimant's RFC is "the most [he] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545, -416.945. The regulations oblige the SSA to assess RFC "based on all the relevant evidence in

[the claimant's] case record," *id.,* and they define "past relevant work" as "work that [the claimant has done] within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it."  20 C.F.R. §§ 404.1560, 0 416.960.  Taken together, the definitions of RFC and "past relevant work" require the ALJ to consider, at Step Four, whether the claimant has the functional ability despite his limitations to perform substantial gainful work that he did within the prior fifteen years.

If the claimant cannot do his past relevant work, the ALJ proceeds to Step Five and considers whether "there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's [RFC], age, education, and work experience."  *McIntyre*, 758 F.3d at 150 (citing *Burgess*, 537 F.3d at 120)).  "An ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing the testimony of a vocational expert."  *Id.* at 151.  "If the ALJ chooses the latter route, she 'may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumption upon which the vocational expert based his opinion.'"  *Peter B. v. Kijakazi*, No. 3:20-cv-966 (TOF), 2022 WL 951689, at *11 (D. Conn. Mar. 30, 2022) (quoting *McIntyre*, 758 F.3d at 150).  The claimant bears the burden of proving his case at Steps One through Four.  *Id.*  At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform."  *Brault v. Soc. Sec. Admin., Comm'r,* 683 F.3d 443, 445 (2d Cir. 2012) (per curiam).

In reviewing a final decision of the Commissioner, this Court "perform[s] an appellate function."  *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).  Its role is to determine whether the Commissioner's decision is supported by substantial evidence and free from legal error.  "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is

based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).

A disability determination is supported by substantial evidence if a "reasonable mind" could look at the record and make the same determination as the Commissioner. *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (citations omitted). Although the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (quotation marks and citations omitted). When the decision is supported by substantial evidence, the Court defers to the Commissioner's judgment. "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [this court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

An ALJ does not receive the same deference if he has made a material legal error. In other words, district courts do not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## III.    DISCUSSION

As noted above, the Plaintiff makes five principal claims of error. First, he says that the ALJ committed legal error in failing to properly develop the administrative record. (ECF No. 20-

2, at 1-10.)  Second, he argues that the ALJ erred at Step Two in holding that his fibromyalgia was not a medically determinable impairment.  (*Id.* at 11-13.)  Third, he says that the ALJ had an insufficient basis for concluding, at Step Four, that he could do the job of case manager as that job is "generally performed."  (*Id.* at 13-20.)  Fourth, he argues that the ALJ should not have accepted VE Baruch's testimony about the number of "document preparer" jobs that are available in the national economy.  (*Id.* at 21.)  Fifth and finally, he says that ALJ Thomas deprived him of a fair hearing by cutting off his counsel's examination.  (*Id.* at 21-24.)

The Plaintiff's first and fifth claims of error present threshold questions that courts ordinarily address first.  *See, e.g., Trasielyn A. v. Kijakazi*, No. 3:21-cv-253 (TOF), 2022 WL 4129343, at *5 (D. Conn. Sept. 12, 2022) ("[W]hether an ALJ has met her duty to develop the record is a threshold question that must be addressed before the court can consider whether the Commissioner's final decision was supported by substantial evidence."); *Crews v. Astrue*, No. 10-Civ.-516 (LTS) (FM), 2012 WL 1107685, at *14 (S.D.N.Y. Mar. 27, 2012), *report and recommendation adopted*, 2012 WL 2122344 (S.D.N.Y. June 12, 2012) (stating that courts "must be satisfied that a claimant has had a full and fair hearing before determining whether the Commissioner's conclusions are supported by substantial evidence").  In this case, however, the sufficiency of the record is intertwined with the ALJ's approach to the Plaintiff's fibromyalgia diagnosis.  It therefore makes sense to discuss the second claim of error first.

### A.    Step Two and Fibromyalgia

#### 1.    *Standards for evaluating the medical determinability of fibromyalgia*

Fibromyalgia "is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months."  SSR 12-2p, at *2.  It is an unusual disease in that "there are no objective tests which can . . . confirm"

it. *Green-Younger v. Barnhart*, 335 F.3d 99, 109 (2d Cir. 2003) (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988)).  As Judge Posner once explained, fibromyalgia's "cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996); *see also Johnston v. Barnhart*, 378 F. Supp. 2d 274, 281 (W.D.N.Y. 2005) ("[A] diagnosis of fibromyalgia is based primarily, if not entirely, on subjective complaints of pain.").

In 2012, the SSA adopted rules for evaluating disability claims arising out of this unique disease.  SSR 12-2p.  Those rules set forth, among other things, the standards for determining whether fibromyalgia constitutes a medically determinable impairment in the context of a particular claim.  *Cooper*, 2019 WL 1109573, at *4.  For his condition to be regarded as medically determinable, the claimant must first show that he was diagnosed with fibromyalgia by a licensed medical or osteopathic doctor who has reviewed his medical history and conducted a physical exam.  SSR 12-2p, at *2.  Second, the diagnosis must not be "inconsistent with the other evidence in the person's case record."  *Id.*  Third, the claimant must provide evidence that one of two sets of diagnostic criteria have been satisfied.  *Id.*  The two sets of criteria are set forth in Sections II.A and II.B of SSR 12-2p.  The criteria in Section II.A are "generally base[d] on the 1990 American College of Rheumatology (ACR) Criteria for the Classification of Fibromyalgia."  *Id.* at *2.  The standards in Section II.B are based on "the 2010 ACR Preliminary Diagnostic Criteria."  *Id.*  Each set of diagnostic criteria has three elements.  *Id.* at *2-3.

The first and third elements of each set are essentially identical.  The first Section II.A criterion is that the claimant must have "[a] history of widespread pain – that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back) – that has

persisted (or that persisted) for at least 3 months." SSR 12-2p, at *2. The first element of the Section II.B is likewise "[a] history of widespread pain," and it refers the reader to Section II.A for the relevant definition. *Id.* at *3. The third criterion in Section II.A is "[e]vidence that other disorders that could cause the symptoms or signs were excluded," because "it is common in cases involving [fibromyalgia] to find evidence of examinations and testing that rule out other disorders that could account for the person's symptoms and signs." *Id.* The Section II.B criteria likewise require as their third element "[e]vidence that other disorders . . . were excluded," and they again refer the reader to Section II.A. *Id.*

The two sets of diagnostic criteria differ principally in their second element. The second criterion of Section II.A requires evidence of "[a]t least 11 positive tender points on physical examination," and moreover "[t]he positive tender points must be found bilaterally (on the left and right sides of the body) and both above and below the waist." *Id.* The second element of Section II.B, by contrast, focuses not on "tender points" but rather on fibromyalgia "symptoms, signs, or co-occurring conditions." *Id.* Specifically, the element is satisfied if the record reflects "[r]epeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome." *Id.* A footnote explains that "symptoms and signs" can include "muscle pain, irritable bowel syndrome . . . headache, pain or cramps in the abdomen, numbness or tingling . . . insomnia . . . nausea . . . [and] diarrhea," among many other conditions. *Id.* at *3 n.9. Another footnote explains that "co-occurring conditions" can include irritable bowel syndrome, gastroesophageal reflux disease ("GERD"), and migraine, among others. *Id.* at *3 n.10.

The claimant need only show that he satisfies one set of criteria. In SSR 12-2p the two sets are separated by the disjunctive "or," and accordingly the claimant is not required to show that he meets both. SSR 12-2p, at *2 (stating that the SSA "will find that a person has [a medically determinable impairment] of [fibromyalgia] if the physician diagnosed [fibromyalgia] and provides the evidence we describe in section II.A *or* section II.B") (emphasis added). Several courts within the Second Circuit have described the two sets as "alternative[]" routes to demonstrating satisfaction of the second element of the test for medical determinability. *E.g., Kirsten B. v. Comm'r of Soc. Sec.*, No. 20-cv-1275 (FPG), 2022 WL 2662968, at *3 (W.D.N.Y. July 11, 2022); *Villar v. Comm'r of Soc. Sec.*, No. 19-cv-144, 2020 WL 1131225, at *2 (W.D.N.Y. Mar. 9, 2020); *Monique Danielle W. v. Comm'r of Soc. Sec.*, No. 5:18-cv-184, 2019 WL 2358529, at *4 (N.D.N.Y. June 4, 2019). An ALJ's failure to address both sets of criteria constitutes a legal error entitling the plaintiff to remand. *Wilma M.S. v. Comm'r of Soc. Sec.*, No. 20-cv-6383 (LJV), 2022 WL 138537, at *4 (W.D.N.Y. Jan. 14, 2022), *vacated on other grounds*, 2023 WL 5723067, at *2 (W.D.N.Y. Sept. 5, 2023).

### 2.      The ALJ's analysis

In this case, the ALJ began his assessment of the medical determinability of the Plaintiff's fibromyalgia by acknowledging that he had been diagnosed with the disease. The ALJ wrote that, "[i]n order to establish [fibromyalgia] as a medically determinable impairment, there must first be evidence of a diagnosis by an acceptable medical source, *e.g.*, a licensed physician." (R. 2230.) He then noted that "[i]n this case, the claimant's rheumatologist Fotios Koumpouras, M.D., listed [fibromyalgia] among the claimant's diagnoses." (*Id.*) (citing R. 976, 1333).

The ALJ next addressed whether "the criteria for a diagnosis of [fibromyalgia] are met and are documented in the record." (*Id.*) He acknowledged that "[a] claimant's impairment can be

analyzed with either" the Section II.A or the Section II.B criteria. (*Id.*) He further recognized that the first and third elements of the two sets are similar in that they require "evidence of a history of widespread pain and evidence that other disorders that could cause similar symptoms have been excluded, such as osteoarthritis, systemic lupus erythematosus, or inflammatory arthritis." (*Id.*) And he also noted that each set had a different second element; whereas the Section II.A criteria "require[] evidence of at least 11 positive tender points on examination," the Section II.B standards "require[] evidence of repeated manifestations of six or more FM symptoms, signs or co-occurring conditions, e.g., fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety or irritable bowel syndrome." (*Id.*)

The ALJ then held that the Plaintiff's fibromyalgia was not medically determinable because "[t]here is no evidence that the criteria of either diagnostic model are met in this case." (R. 2230-31.) With respect to the Section II.A criteria – which, again, focus on "tender points" – he noted that Dr. Koumpouras had observed "tenderness upon examination" but had also once stated that the Plaintiff "lacked the classic [fibromyalgia] trigger points." (R. 2231) (citing R. 1944). The ALJ went on to say that "[t]here is no evidence of multiple positive tender points upon examination." (R. 2231.) With respect to the Section II.B criteria, the ALJ held that the record contained no "evidence of repeated manifestations of six or more [fibromyalgia] signs, symptoms or co-occurring conditions." (*Id.*) He concluded by stating that, "[b]ecause the evidence does not establish that [*sic*] criteria for a diagnosis," fibromyalgia "is not a medically determinable impairment in this claim." (*Id.*)

### 3. *Analysis*

On appeal, the Plaintiff contends that the ALJ's conclusion was erroneous in two principal respects. First, he says that the record *did* contain "evidence of multiple positive tender points

upon examination," and that the Section II.A criteria were therefore satisfied.  (ECF No. 20-2, at

11.)  He points to a January 14, 2016 report of a musculoskeletal examination by Dr. Omoye

Imoisili, in which the doctor found "[d]iffuse tenderness throughout, including in 16/18

fibromyalgia points."  (ECF No. 20-2, at 12) (citing R. 1072).  Second, he argues that "[t]he

evidence of Record plainly establishes the presence of six or more fibromyalgia 'signs, symptoms

or co-occurring conditions," thus satisfying the Section II.B criteria.  (ECF No. 20-2, at 12.)

Although the ALJ's opinion was otherwise very thorough, I agree with the Plaintiff that

his conclusions about the second Section II.A criterion were unsupported by substantial evidence.

That criterion requires evidence of "[a]t least 11 positive tender points on physical examination,"

SSR 12-2p, at *2, and it is simply untrue that "no" such evidence existed, as the ALJ said.   (R.

2230-31.)  Dr. Imoisili expressly identified sixteen such points in one examination (R. 1072), and

Dr. Koumpouras identified more than twenty tender points in multiple examinations.  (*E.g.*, R.

1331, 1398-99, 1919.)  Of course, Dr. Koumpouras did not say whether those points corresponded

with the traditional fibromyalgia examination points (*id.*), and he did say on one occasion that the

Plaintiff "lack[ed] the classic fibromyalgia trigger points."  (R. 1944.)  Thus, if the ALJ had

weighed the mixed evidence – or, better yet, developed the record to clarify it – and concluded

that the second Section II.A criterion had not been satisfied, his opinion might have stood on a

different footing.  But it is simply mistaken to say, as he did, that there is "no evidence" of enough

trigger points to meet the standard.  (R. 2231.)

The Commissioner disagrees, but his argument is unpersuasive.  He notes that the Section

II.A criteria require more than mere documentation of eleven tender points; they also require that

those points be distributed "bilaterally and both above and below the waist."  (ECF No. 21-1, at 5)

(citing SSR 12-2p, at *3).  He therefore argues that, because the Imoisili report "did not indicate

whether Plaintiff's tender points were on both sides of his body, above and below the waist," it is "insufficient to provide the requisite description of the location of tender points to meet the [Section II.A] criteria." (*Id.* at 5-6.)  But this argument appears nowhere in the ALJ's decision, and it is well established that a reviewing court "may not accept appellate counsel's *post hoc* rationalizations" for agency action.  *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *see also Andino v. Saul*, No. 1:18-cv-379 (JJM), 2019 WL 4621878, at \*5 (W.D.N.Y. Sept. 24, 2019) (observing that "any explanation that [the ALJ] failed to provide cannot be supplied by the Commissioner *post hoc*"). In this case, the ALJ did not say that the Plaintiff's tender points were in the wrong places on his body, as the Commissioner now contends.  Rather, he said that there was no evidence of multiple tender points at all (R. 2231), and that was inaccurate.  (R. 1072.)

Moreover, even if the ALJ had suspected that the Plaintiff's tender points were in the wrong places, the proper course of action would have been to seek clarification from his doctors.  When there is "abundant record evidence showing that Plaintiff had fibromyalgia – including numerous medical diagnoses – if there [is] uncertainty about whether this evidence met the fibromyalgia criteria, the ALJ ha[s] a duty to further develop the record."  *Rodriguez v. Comm'r of Soc. Sec.*, No. 20-Civ.-2819 (AJN) (SLC), 2021 WL 4462000, at \*14 (S.D.N.Y. June 16, 2021).  Here, the record was at least uncertain.  While Dr. Koumpouras did once say that the Plaintiff "lack[ed] the classic fibromyalgia trigger points" (R. 1944), the ALJ had no basis for concluding that this was anything other than a snapshot in time, and longitudinal perspective is particularly important in fibromyalgia cases.  *See* SSR-12-2p, at \*5 (noting that "the symptoms and signs of [fibromyalgia] may vary in severity over time and may even be absent on some days"); *Ingrid T.D. v. Comm'r of Soc. Sec.*, No. 1:20-cv-5651 (GRJ), 2022 WL 683034, at \*7 (S.D.N.Y. Mar. 8, 2022) (observing

that the symptoms of plaintiff's claimed fibromyalgia and somatic symptom disorder "can be expected to wax and wane over time"). In short, the record was at least unclear with respect to the number and location of the Plaintiff's tender points, and if the ALJ had been concerned about that issue, he would have been obliged to clear it up with the Plaintiff's physicians. *Cooper*, 219 WL 1109573, at *4 (holding, in case where the ALJ regarded the record as lacking "sufficient detail" about tender points, that he was obliged to contact the doctor to determine whether the claimant's fibromyalgia "satisfies the criteria set forth in SSR 12-2p").

I also agree with the Plaintiff that the ALJ's conclusions about the second Section II.B criterion were unsupported by substantial evidence. That criterion requires "[r]epeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions," SSR 12-2p, at *2, and it was mistaken of the ALJ to say that the record contained "no evidence" of this. (R. 2231.) The Plaintiff's medical records contain multiple references to (1) irritable bowel syndrome (R. 2021, 2220, 2553, 2587, 2748, 2752, 2903,2958); (2) GERD (R. 2533, 2708, 2720); (3) nausea (R. 2521, 2542, 2555, 2605, 2651, 2655, 2657, 2678, 2720); (4) numbness or tingling (R. 1044, 2742, 2776, 2906, 2943); (5) insomnia (R. 709, 1069, 2542, 2651); (6) abdominal cramping (R. 2709, 2946); and (7) migraine. (R. 1937, 2555, 2651.) All of these are fibromyalgia "symptoms, signs, or co-occurring conditions." SSR 12-2p, at *3 nn.9, 10. Indeed, on appeal the Commissioner does not dispute that the Plaintiff adduced enough evidence to get past the second Section II.B criterion. (*See* ECF No. 21-1, at 6) (failing to dispute that the record contained evidence of six or more symptoms, signs, or co-occurring conditions).

The Commissioner instead responds by pivoting to the third Section II.B criterion (*id.*), but this argument also fails. The third criterion requires "[e]vidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were

excluded," SSR 12-2p, at *3, and the Commissioner says that the "Plaintiff's providers believed his symptoms to be a result of hypermobility and/or a variation of" EDS.  (ECF No. 21-1, at 6.) But this argument is another impermissible "*post hoc* rationalization."  *Snell*, 177 F.3d at 134.  The ALJ did not hold that the Plaintiff's fibromyalgia was medically undeterminable because the third of the Section II.A. and Section II.B criteria had not been met.  (R. 2230-31.)  Rather, he (1) held that the first Section II.A/B criterion had been satisfied by Dr. Koumpouras's diagnosis (R. 2230); (2) held that the second of the Section II.A criteria had not been met because there "was no evidence of multiple positive tender points" (R. 2231); (3) held that the second of the Section II.B criteria had not been met because there was no evidence "of repeated manifestations of six or more [fibromyalgia] signs, symptoms, or co-occurring conditions" (*id.*); and (4) stopped there without meaningfully addressing the third criterion.[4]

The Commissioner's final argument is an appeal to the "harmless error" principle.  He contends that, "even if the ALJ should have found Plaintiff's alleged fibromyalgia to qualify as a severe, medically determinable impairment, any error in the analysis at step two of the sequential evaluation would be harmless where, as here, the ALJ found that the claimant had other severe impairments and continued beyond step two."  (ECF No. 21-1, at 6.)  He cites *Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) as an example of the harmless error principle in action. (*Id.*)  He could have cited many other authorities for the proposition that many Step Two *severity* errors are harmless.  *E.g., Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (summary order); *Sheila Renee H. v. Kijakazi*, No. 3:23-cv-944 (TOF), 2022 WL 4181723, at *9 (D. Conn.

---

[4]    While the ALJ did mention that "Dr. Koumpouras stated that the claimant's *arthritic* symptoms were a result of hypermobility" (*id.*) (emphasis added), this one-sentence statement does not address the full range of *fibromyalgia* symptoms.  Although some fibromyalgia symptoms are arthritis-like in nature, many others are not.  *See* SSR 12-2p, at *3 n.9.

Sept. 13, 2022) (affirming ALJ's decision where, although he failed to recognize plaintiff's claimed "major depression" as a severe impairment at Step Two, he considered her "depressive disorder and her consequent limitations at the subsequent steps").

This argument, however, misses the distinction between severity and medical determinability. Courts routinely hold that "the step two harmless error doctrine is inapplicable" to a determination that an impairment is not medically determinable. *E.g., Janine H. v. Comm'r of Soc. Sec.*, No. 19-cv-1432 (FPG), 2021 WL 1185872, at *4 (W.D.N.Y. Mar. 30, 2021); *Diaz v. Comm'r of Soc. Sec.*, No. 18-cv-6224P, 2019 WL 2401593, at *5 (W.D.N.Y. June 7, 2019); *Cooper*, 2019 WL 1109573, at *5; *Keller*, 2017 WL 4112024, at *14. The distinction "is significant because an ALJ may credit a claimant's statements about her symptoms and functional limitations only if the impairment to which they relate is medically determinable." *Janine H.*, 2021 WL 1185872, at *4. Put differently, if an ALJ concludes that a claimant's fibromyalgia is not a medically determinable impairment, she has "no basis to credit the plaintiff's statements regarding her fibromyalgia-related symptoms in the remainder of her decision." *Id.*

Indeed, this case illustrates the problem identified by these courts. Take, for example, the Plaintiff's co-occurring condition of irritable bowel syndrome, which the SSA acknowledges is worthy of "especial[]" consideration in determining whether the second Section II.B criterion is met. SSR 12-2p, at *3. The Plaintiff testified at his second hearing that he experienced bowel irritation upon waking up in the morning, and that he had to go to the bathroom "for a very long time and also repeatedly . . . . [s]ometimes up to five times in the morning alone." (R. 2270.) Yet in the ALJ's RFC analysis, there is no discussion of the Plaintiff's claimed need to spend so much time in the bathroom. After the ALJ determined that the Plaintiff's fibromyalgia was not medically

determinable, the co-occurring condition of irritable bowel syndrome evidently dropped out of consideration, as cases like *Janine H.* would have predicted.

To be sure, the record contains some reasons to suspect that the Plaintiff's fibromyalgia is either not medically determinable or non-severe. The diagnosis does not appear in the "visit diagnoses" section of some of Dr. Koumpouras's reports (*e.g.*, R. 2779), suggesting that the doctor may not have thought that fibromyalgia was responsible for that day's complaints, and he did once say that the Plaintiff lacked the classic fibromyalgia trigger points (R. 1944), as the Commissioner notes. Moreover, the Plaintiff himself downplayed the role of fibromyalgia in his symptoms and limitations. (R. 2269) (referring to fibromyalgia as "kind of a secondary diagnosis"). But he is entitled to have the question of medical determinability analyzed in accordance with SSR 12-2p, and to expect that the analysis will be supported by substantial evidence. Because those things did not happen, I recommend that the ALJ's decision be reversed and that the Plaintiff's case be remanded for a new hearing.

**B.    The Plaintiff's Other Claims of Error**

The foregoing recommendation, if adopted, would moot the Plaintiff's other claims of error. I will nevertheless address some of them, for the guidance of the parties and the ALJ on remand and for the assistance of the District Judge.

*1.    Duty to develop the record*

The Plaintiff argues that the ALJ failed in his duty to compile a complete record in four principal respects. First, he says that the ALJ was required to – but did not – obtain medical source statements from Dr. Koumpouras and from his primary care physician, Dr. Thomas McCarty. (ECF No. 20-2, at 1-2.) Second, he notes that there is a gap in the medical records between his visit to the UConn Health Center on May 6, 2009, and his visit to Yale Orthopaedics and

Rehabilitation on January 8, 2016. (ECF No. 20-2, at 1) (citing R. 2185-86, 862-77.) Third, he cites another gap in the records between December 31, 2019 and March 18, 2021. (*Id.* at 2.) Fourth, he notes that in a 2,992-page administrative record, there is a single, half-sentence notation that he "sees a therapist privately," and he argues that this entry obliged the ALJ to obtain the therapist's records. (*Id.*) (citing R. 1117). While the ALJ may wish to pursue medical source statements from Drs. Koumpouras and McCarty on remand, I do not regard the other three record-development arguments as independent bases for remand, for several reasons.

First, the Plaintiff has not met his burden to show that he was prejudiced by the absence of these allegedly missing records. "When an unsuccessful claimant files a civil action on the ground of inadequate development of the record, the issue is whether the missing evidence is significant." *Santiago v. Astrue*, No. 3:10-cv-937 (CFD), 2011 WL 4460206, at *2 (D. Conn. Sept. 27, 2011) (citing *Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996)). "The plaintiff in a civil action must show that he was harmed by the alleged inadequacy of the record." *Id.* (citing *Shinseki v. Sanders*, 556 U.S. 396, 129 S.Ct. 1696, 173 L.Ed.2d 532 (2009)); *see also Mahmud v. Saul*, No. 3:19-cv-1666 (TOF), 2020 WL 6866674, at *12 (D. Conn. Nov. 23, 2020). To demonstrate such harm, a plaintiff "must show that the additional medical reports would undermine the ALJ's decision," *Lena v. Astrue*, No. 3:10-cv-893 (SRU), 2012 WL 171305, at *9 (D. Conn. Jan. 20, 2012) (internal quotation marks omitted), because "[m]ere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Nelson v. Apfel*, 131 F.3d 1228, 1235 (2d Cir. 1997); *see also Jennifer Lynn E.*, 2021 WL 4472702, at *6-7 (declining to remand for failure to obtain a retrospective treating source opinion, because "the Plaintiff has not come forward with sufficient reasons to suppose that a retrospective opinion would undermine the ALJ's decision") (citation and quotation marks omitted). Here, the Plaintiff offers no concrete

reason to suppose that the allegedly missing records even exist, much less that they would undermine the ALJ's decision. *See Reices-Colon*, 523 F. App'x at 799 (concluding that the claimant's record supplementation argument was baseless because she identified no specific record that was missing or explained how it would affect her case); *see also Crespo v. Comm'r of Soc. Sec.*, No. 3:18-cv-00435 (JAM), 2019 WL 4686763, at *5 (D. Conn. Sept. 25, 2019) (concluding that the claimant did not show "the absence of meaningful records").

Second, it matters that the Plaintiff's counsel informed the SSA that the record was complete. An ALJ's duty to develop the record is not unlimited; he is required only to take all *reasonable* steps to do so, and he "has taken reasonable steps to complete the medical record when [he] asks the claimant's attorney at a hearing if the medical records . . . are complete, and the attorney answers affirmatively." *Jason C. v. Berryhill*, No. 6:17-cv-1106 (TWD), 2019 WL 1409804, at *5 (N.D.N.Y. Mar. 28, 2019) (citing cases). In *Curley v. Commissioner of Social Security Administration*, for example, a plaintiff contended that an ALJ committed reversible error in failing to obtain records from her physical therapist. 808 F. App'x 41, 44 (2d Cir. 2020) (summary order). The court rejected the argument because, "[w]hen the ALJ discussed the medical records with Curley and his attorney at the beginning of the hearing and asked whether anything was missing, Curley did not state that he had any physical therapy records that needed to be obtained." *Id.*; *cf. also Bowen*, 482 U.S. at 146 n.5 ("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so."). In this case, the ALJ held the record open for thirty days after the hearing (R. 2294), after which Plaintiff's counsel's office called the SSA and advised that, aside from one possible ophthalmology note, "the record [was] complete." (R. 2524.) The Plaintiff did not identify any of the alleged gaps that he now cites as bases for remand. (*Id.*)

Third, the ALJ did not commit reversible error by failing to request additional records upon seeing a half-sentence notation about psychotherapy.  When the record is already voluminous, an ALJ is not required to develop it further "in response to a few stray remarks unsupported by other record evidence and not alleged . . . as a potential disability." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 32 (2d Cir. 2013) (summary order).  In *Roxanne C. v. Kijakazi*, for example, the claimant's application for disability focused on her "mental health and breast cancer medical issues, not any orthopedic issues."  628 F. Supp. 3d 405, 414 (D. Conn. 2022).  Her administrative record nonetheless referenced a car accident, a slip and fall on ice, and a request for a consultation with an orthopedist.  *Id.* at 411.  The ALJ evidently did not pursue the records from those complaints, and on appeal to this court, the claimant contended that this was error.  *Id.* at 414.  But Judge Nagala disagreed, because an ALJ is under no obligation to chase medical records relating to conditions that were not alleged to be a basis for disability, in response to "a few stray remarks" in the file.  *Id.* (quoting *Tankisi*, 521 F. App'x at 32).  That is the case here.  The Plaintiff did not cite any mental health condition as a basis for disability, either in his application or his hearing testimony (R. 327-28, 2265-66), and the references to such conditions in his record are no less "stray" than the references to orthopedic conditions in *Roxanne C.'s* record.  In summary, while the ALJ will want to consider the need for further development of the record on remand, the Plaintiff's arguments do not supply independent bases for reversal.

Section I of the Plaintiff's brief is entitled "The Administrative Record Was Not Developed" (ECF No. 20-2, at 1), but in it, he briefly raises three other issues.  First, he chides the ALJ for assigning "some persuasiveness" to the reports of the state agency consultants, Drs. Connolly and Rutherford.  (*Id.* at 8; *see also* R. 2239.)  Noting that "[n]either of these physicians ever examined" him, he cursorily argues that their evaluations "deserve little weight in the overall

evaluation of disability." (ECF No. 20-2, at 8 & n.25) (quoting *Vargas v. Sullivan*, 898 F.2d 293, 295-96 (2d Cir. 1990)). He does not identify anything that the two doctors got wrong, and thus his challenge is best construed as a blanket attack on the use of non-examining consultants to evaluate disability.

This attack contradicts established law. "It is well-settled that a consulting physician's opinion can constitute substantial evidence supporting an ALJ's conclusions." *Suarez v. Colvin*, 102 F. Supp. 3d 552, 557 (S.D.N.Y. 2015) (collecting cases). Of course, "[c]ourts in this Circuit long have casted doubt on assigning significant weight to the opinions of consultative examiners when those opinions are based solely on a review of the record." *Soto v. Comm'r of Soc. Sec.*, No. 19-cv-4631 (PKC), 2020 WL 5820566, at *7 (E.D.N.Y. Sept. 30, 2020). But if those opinions have proper support in the record, "[a]n ALJ is entitled to rely on the opinions of both examining and non-examining State agency medical consultants, because those consultants are deemed to be qualified experts in the field of social security disability." *Wilson v. Saul*, No. 3:18-cv-1097 (WWE), 2019 WL 2603221, at *11 (D. Conn. June 25, 2019). In this case, the ALJ carefully documented the places where the two doctors' opinions were supported by the record (R. 2240), and in those instances where he felt that the opinions were not supported, he disagreed with the doctors in the Plaintiff's favor. (*Id.*) (stating that "additional evidence received in the course of developing the claimant's case for review at the hearing, justify a conclusion that his impairments are more limiting than was concluded by the state examiners, especially regarding his exertional and postural limitations").

The Plaintiff next complains that the ALJ "'cherry-picked' the record" (ECF No. 20-2, at 9), but this claim is similarly unpersuasive. "The term 'cherry' picking generally refers to improperly crediting evidence that supports findings while ignoring conflicting evidence from the

same source." *Sonia N.B.A. v. Kijakazi*, No. 3:21-cv-709 (TOF), 2022 WL 2827640, at *8 (D. Conn. July 20, 2022) (quoting *Rodriguez v. Colvin*, No. 3:13-cv-1195 (DFM), 2016 WL 3023972, at *2 (D. Conn. May 25, 2016)).  "It is not the proper term to apply when an ALJ 'considers the bad as well as the good' from a given source." *Lisette R. o/b/o C.J.O. v. Kijakazi*, No. 3:22-cv-784 (TOF), 2023 WL 6357961, at *4 (D. Conn. Sept. 29, 2023) (quoting *Sheila Renee H. v. Kijakazi*, No. 3:21-cv-944 (TOF), 2022 WL 4181723, at *7 (D. Conn. Sept. 13, 2022)) (brackets omitted).  That is what the ALJ did in this case.  To be sure, he "recite[d] a litany of benign findings" in the notes from one treating physician, Dr. Jenny Xiang, as the Plaintiff notes.  (ECF No. 20-2, at 9; *see also* R. 2243.)  But he also cited other evidence that would support a high degree of limitation, including evidence from Dr. Xiang; in particular, he accepted the doctor's conclusion that the Plaintiff could "not climb ladders, ropes or scaffolds given his history of joint mobility." (R. 2243.)  "Sometimes, that which a claimant calls 'cherry-picking' is more accurately described as merely weighing the evidence.'" *Sheila Renee H.*, 2022 WL 4181723, at *7 (quoting *Sonia N.B.A.*, 2022 WL 2827640, at *12).  That is the case here.

Finally, the Plaintiff raises a thinly developed challenge to the ALJ's handling of the opinion evidence.  (ECF No. 20-2, at 9-10.)  The ALJ found Dr. Xiang's "physical capacity statement" (R. 2217-21) to be "less persuasive" (R. 2243), and the Guarnaccia/Garrett consultative examination report to be "minimally persuasive."  (R. 2241.)  On appeal to this court, the Plaintiff argues in a single sentence that the ALJ's reasons for discounting Dr. Xiang were "insubstantial" (ECF No. 20-2, at 9) and that his reasons for discounting the Guarnaccia/Garrett report were "unsupported."  (*Id.* at 10.)  With respect to the latter, he notes that the two examiners took detailed range-of-motion measurements, and he faults the ALJ for allegedly disregarding them.  (*Id.*)  The examiners had noted reduced range of motion, but also "agile . . . movement" (R. 1826), and the

Plaintiff argues in a single paragraph that the ALJ took the latter comment out of context.  (ECF No. 20-2, at 10.)

These challenges implicate established principles.  For claims like the Plaintiff's, that were filed after March 27, 2017, the SSA is no longer obliged to give "any specific evidentiary weight, including controlling weight," to any particular medical opinion.  20 C.F.R. §§ 404.1520c(a), -416.920c(a).  ALJs must, however, "articulate . . . how persuasive [they] find all of the medical opinions and all of the prior administrative medical findings in [the] case record," considering (1) the opinion's supportability, (2) the opinion's consistency, (3) the source's relationship with the claimant, (4) the source's specialization, and (5) other factors, such as the source's "familiarity with other evidence in the claim or an understanding of [the SSA's] disability program's policies and evidentiary requirements."  20 C.F.R. §§ 404.1520c(b), (c); -416.920c(b), (c).  The ALJ must explicitly articulate how he considered the supportability and consistency of the medical opinion.  *See* 20 C.F.R. §§ 404.1520c(b)(2), -416.920c(b)(2).  The ALJ may, but is not required to, explain how he considered the other factors.  *Id.*  When considering "supportability," ALJs are directed to look to "the objective medical evidence and supporting explanations presented by a medical source . . . to support his or her medical opinion(s)[.]"  20 C.F.R. §§ 404.1520c(c)(1); -416.920c(c)(1).  The "consistency" factor goes to the opinion's consistency with other evidence in the record.  "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. §§ 404.1520c(c)(2), -416.920c(c)(2).  Like any other ALJ determination, the supportability and consistency determinations must be based on substantial evidence.  *See, e.g., Deshotel v. Berryhill*, 313 F. Supp. 3d 432, 434 (W.D.N.Y. 2018) (citing *Tankisi*, 521 F. App'x at 29).

In this case, the ALJ's treatment of the opinion evidence was both adequately explained and supported by substantial evidence.  With respect to Dr. Xiang, the ALJ discussed "the source's relationship with the claimant" when he noted that the doctor had seen the Plaintiff only four times. (R. 2243, 2217.)  Even more importantly, he addressed the supportability of Dr. Xiang's opinions when he observed that they were "not supported by her own treatment notes."  (R. 2243.)  The doctor had opined (among other things) that the Plaintiff could not lift more than five pounds and could not walk for more than thirty minutes (R. 2219-20), but the ALJ concluded that these opinions were unsupported by treatment notes documenting "no acute distress," "intact extremity strength," and the lack of any need for "an assistive device."  (R. 2243.)  The ALJ also addressed the consistency of Dr. Xiang's opinions when he observed that they were "also inconsistent with the other evidence of record."  (*Id.*)  He buttressed this observation with twenty record citations documenting "independent gait, no extremity edema, normal ranges of joint and spinal motion, 4-5/5 extremity and grip strength, intact extremity sensations, normal reflexes and the ability to walk on heels and toes," and the ability to "dog walk for five hours a week."  (*Id.*); *see also Joseph L. v. Kijakazi*, No. 3:22-cv-183 (TOF), 2023 WL 1432630, at *4-5 (D. Conn. Feb. 1, 2023) (affirming Commissioner's decision where ALJ adequately discussed supportability and consistency factors).

The ALJ's treatment of the Guarnaccia/Garrett report was likewise sufficiently explained and supported by substantial evidence.  The report had said that the Plaintiff could not tolerate "typing or writing constantly" (R. 1827), but the ALJ addressed the supportability of this opinion when he noted that the examiners had elsewhere documented "normal ranges of hand and wrist motion."  (R. 2241.)  The report had also referenced the Plaintiff's claimed "need for frequent position changes," but the ALJ discussed the consistency of this opinion when he cited the many treatment notes documenting "4-5/5 extremity and grip strength, normal ranges of joint and spinal

motion, normal reflexes, intact extremity sensations and independent gait." (*Id.*)  In short, the ALJ complied with the regulations regarding the treatment of medical opinions, and he did not commit any of the other errors alleged in Section I of the Plaintiff's brief.

### 2.    *Full and fair hearing*

The Plaintiff also argues that the ALJ deprived him of a full and fair hearing by cutting off his counsel's examination.  (ECF No. 20-2, at 21-24.)  If my recommendation respecting fibromyalgia were to be accepted, the Plaintiff would of course get a new hearing, and this argument would be moot.  If the District Judge nonetheless reaches this issue, however, I would recommend that the Plaintiff's challenge be rejected.

To review, the Plaintiff's challenge concerns the ALJ's conduct at the third of his three hearings – the hearing on March 11, 2022.  (*Id.* at 21.)  Attorney Shapiro had been examining the Plaintiff about his "vertebra popping out of position," and in response to one question, the Plaintiff gave a rambling, 123-word answer.  (R. 2280-81.)  When the answer ended, the ALJ interjected: "Counsel, we have got about a minute left please."  (R. 2281.)  Attorney Shapiro protested that he did not know if he could ask everything he needed to ask in a single minute, and the ALJ responded:  "We are not going to go over every detail as you know for treatment care.  We have 31 exhibits already to look at."  (*Id.*)  Attorney Shapiro then asked a few questions about the Plaintiff's massage regimen (R. 2281-82), after which the ALJ said, "[a]ll right, Counsel.  Last question."  (R. 2282.)  Counsel then asked a single question about the Plaintiff's problems with keyboarding (*id.*), after which the ALJ asked a few of his own.  (R. 2283-84.)  The ALJ then began to turn to the VE, but Attorney Shapiro protested that he had not had an opportunity to ask the Plaintiff "questions about days when he is immobilized and unable to get out of bed."  (R. 2284.) The ALJ responded:

> You can give us a note on that.  Maybe there are some judges that let you spend all day with a hearing and go over every detail.  The claimant gives on average 50-to-100 word answers to every question.  I just can't afford to stay here all day.  It is just not done as you well know.  Please give us a note on that after the hearing.  We will take up the vocational expert now[.]

(R. 2284.)  Attorney Shapiro submitted a note later that day (R. 2522), but the note merely protested that he had been cut off from "inquir[ing] about topics including but not limited to claimant's headaches, his dog walking activity, and about days (and parts of days) when he is bedbound."  (*Id.*)  The note did not offer any information about what this inquiry would have revealed.  (*Id.*)

On appeal, the Plaintiff contends that he was not afforded procedural due process.  (ECF No. 20-2, at 23.)  He notes that "[i]n an administrative hearing, the ALJ has an affirmative obligation to actually assist the claimant in developing facts rather than acting either as an adversary or creating an 'atmosphere of alternative indifference, personal musings, impatience and condescension.'"  (*Id.* at 23) (quoting *Ventura v. Shalala*, 55 F.3d 900, 904-05 (3d Cir. 1995)).  He asserts that the unheard testimony would have been "potentially dispositive," and that he was deprived of due process by an ALJ who did not want to "stay here all day."  (*Id.* at 24.)

The Commissioner unsurprisingly disagrees.  He begins by noting that the above-referenced hearing was only one of three, and that the ALJ gave the Plaintiff ample opportunities to testify about a variety of topics on the other two occasions as well as on March 11, 2022.  (ECF No. 21-1, at 20.)  He states that "Plaintiff, represented by counsel, had three opportunities to provide testimony about his conditions, treatment, and work, and the ALJ had before him thousands of pages of records to consider in determining Plaintiff's disability claim."  (*Id.* at 21.)  He adds that, under the SSA's Hearings, Appeals, and Litigation Law Manual ("HALLEX"), ALJs are permitted to "determine[] the subject and scope of testimony from a claimant and any witness(es), as well as how and when the person testifies at the hearing."  (*Id.*)  In closing, he

argues that "[w]hile Plaintiff prefers that the ALJ would have given him additional time to testify, there is no requirement to do so and Plaintiff's argument that this somehow deprived him of a full and fair hearing should be rejected." (*Id.*)

The Plaintiff is of course right that a claim for Social Security benefits implicates the protections afforded by the Due Process Clause of the Fifth Amendment. *See Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) ("The interest of an individual in continued receipt of [SSDI benefits] is a statutorily created 'property' interest protected by the Fifth Amendment."). "However, because Congress gave the Commissioner much discretion to deal with the millions of decisions [he] must make, what constitutes adequate due process for these hearings differs from that applied in judicial trials." *Carpenter v. Colvin*, No. 5:13-cv-859 (GLS), 2014 WL4637085, at *2 (N.D.N.Y. Sept. 16, 2014) (citing *Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996). Because Social Security hearings are not "full-blown adversarial" proceedings, they are supposed to be "informal," "liberal," and "not strict in tone and operation." *Bush*, 94 F.3d at 46. Importantly, "[t]heir overall conduct ultimately rests in the ALJ's discretion." *Carpenter*, 2014 WL 4637085, at *2 (citing 42 U.S.C. § 405(b)(1) and *Richardson v. Perales*, 402 U.S. 389, 400-01 (1971)).

The Plaintiff cites no authority for the proposition that an ALJ violates these principles by setting reasonable time limits on testimony, and indeed the authorities are to the contrary. In *Chase D. v. Kijakazi*, for example, the ALJ stated at the outset that the hearing would be limited to "30-40 minutes," and the plaintiff challenged the limitation on appeal to the District Court. No. 20-cv-1292 (ADM) (TNL), 2022 WL 479357, at *6-7 (D. Minn. Jan. 31, 2022), *report and recommendation approved and adopted*, 2022 WL 484986 (D. Minn. Feb. 16, 2022). The court held that the requirements of due process had been satisfied by a single, thirty-eight-minute hearing; the opportunity to request a second, supplemental hearing; and the opportunity to "submit

a closing statement to the ALJ in writing." *Id.* at *8.  In *Carolyn K. v. Kijakazi*, an ALJ likewise started a hearing by stating that it would be limited in time, and the plaintiff likewise challenged the limitation on appeal, claiming that she had been "forced to shorten her own testimony."  No. 20-cv-1394 (NEB) (LIB), 2022 WL 543076, at *8 (D. Minn. Jan. 31, 2022), *report and recommendation approved and adopted*, 2022 WL 542418 (D. Minn. Feb. 23, 2022).  The court held that due process had been satisfied by a forty-one-minute hearing in which the plaintiff "testif[ied] about her subjective complaints, how her symptoms prevented her from working, her past employment and the activities she performed therein." *Id.* at *7.

In this case, the Plaintiff was afforded considerably "more process" than the plaintiffs in *Chase D.* and *Carolyn K.*  Whereas those plaintiffs' hearings closed in less than an hour, in this case the Plaintiff had three hearings totaling two hours and thirty-two minutes.  (R. 4, 43; 2298, 2305; 2260, 2295); *see also Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994) (stating that, while the "length of a hearing is not dispositive, it is a consideration" in determining whether the requirements of due process have been met).  Moreover, at the first hearing the ALJ allowed Attorney Shapiro to examine the Plaintiff without interruption until he had "nothing further."  (R. 24-31.)  The ALJ also gave him an opportunity to provide any missing information through a post-hearing note.  (R. 2284.)  In short, the ALJ did not offend due process when he set a reasonable time limit on the Plaintiff's third examination.

The cases cited by the Plaintiff on this point are easily distinguished.  In *Townley v. Heckler* the ALJ decided the question of disability based on a report from a VE, but he had not permitted the claimant's attorney to cross-examine that VE.  748 F.2d 109, 111-12 (2d Cir. 1984).  The Second Circuit held that this offended due process, *id.* at 114, but nothing like that happened in this case; to the contrary, the ALJ allowed the Plaintiff's attorney to cross-examine VE Green at

the first hearing (R. 31-41) and VE Baruch at the third.  (R. 2290-93.)  In *Ventura v. Shalala* the ALJ "demonstrated . . . his impatience and hostility" by, among other things, picking a fight with the claimant over an irrelevant issue.  55 F.3d 900, 903 (3d Cir. 1995).  The Third Circuit held that his "offensive and unprofessional conduct" deprived the claimant of "the full and fair hearing to which he was entitled," *id.* at 905, but again, nothing like that happened in this case.  While some of the ALJ's statements might have benefited from more careful phrasing (*e.g.*, R. 2284) ("I just can't afford to stay here all day."), there is no evidence of the sort of hostility seen in *Ventura* or in the other case cited by the Plaintiff, *Rosa v. Bowen*, 677 F. Supp. 782 (D.N.J. 1988).  Indeed, the ALJ affirmatively displayed concern for the Plaintiff when he adjourned the second hearing until he felt better.  For these reasons, I recommend that if the District Judge reaches the claim of error in Section V of the Plaintiff's brief, that claim be rejected.

### 3.    Step Four error

The Plaintiff next argues that the ALJ erred at Step Four in finding that he could perform his past relevant work as a case manager.  (ECF No. 20-2, at 13-20; *see also* R. 2244-46.)  His argument is partially rooted in the hypothetical questions that the ALJ posed to the VE; he notes, for example, that the hypotheticals did not account for the "frequent bathroom visits" allegedly required by his irritable bowel syndrome.  (ECF No. 20-2, at 20.)  If my Step Two recommendation were to be accepted, this portion of his argument would of course be moot because he would receive a new hearing and, presumably, a new hypothetical.  But there is another aspect to his argument as well: he contends that it was error for the ALJ to assess Step Four with reference to the DOT definition of "social worker," rather than to the job of "case manager" as he actually performed it.  (*Id.* at 13-14.)  If the District Judge reaches this particular challenge, I recommend that it be rejected.

As discussed in Section I above, the Plaintiff testified that he previously worked as "a case manager for people with mental illnesses." (R. 2263.) He added that one previous employer had required him to lift "close to 50" pounds (R. 2264), and that two others had required him to lift up to twenty pounds. (R. 2285.) VE Baruch then testified that the relevant DOT title for a case manager was 195.107-030 (R. 2286), which is entitled "Social Worker – Medical." Dict. of Occupational Titles, 195.103-030 Social Worker, Medical (4th ed. 1991), 1991 WL 671574. She noted the Plaintiff's testimony about lifting twenty – and sometimes close to fifty – pounds, and she acknowledged that he had performed the job at the light and medium exertional levels. (R. 2286.) She nonetheless observed that the job calls only for a sedentary level of exertion as it is described in the DOT.[5] (Id.) After finding that the Plaintiff could perform sedentary work with limitations, the ALJ concluded that he had not passed Step Four because he was "able to perform

---

[5]    The DOT describes the job of "Social Worker, Medical" as follows:

> Assists patients and their families with personal and environmental difficulties which predispose illness or interfere with obtaining maximum benefits from medical care: Works in close collaboration with physicians and other health care personnel in patient evaluation and treatment to further their understanding of significant social and emotional factors underlying patient's health problem. Helps patient and family through individual or group conferences to understand, accept, and follow medical recommendations. Provides service planned to restore patient to optimum social and health adjustment within patient's capacity. Utilizes community resources to assist patient to resume life in community or to learn to live within limits of disability. Prepares patient histories, service plans, and reports. Participates in planning for improving health services by interpreting social factors pertinent to development of program. Provides general direction and supervision to workers engaged in clinic home service program activities. Works in general hospitals, clinics, rehabilitation centers, drug and alcohol abuse centers, or related health programs. May be employed as consultant in other agencies. Usually required to have knowledge and skill in casework methods acquired through degree program at school of social work.

Dict. of Occupational Titles, 195.103-030 Social Worker, Medical (4th ed. 1991), 1991 WL 671574. The DOT goes on to state that the "strength" level required to perform this job is "sedentary" – that is, it requires "[e]xerting up to 10 pounds of force occasionally . . . and/or a negligible amount of force frequently . . . to lift, carry, push, pull, or otherwise move objects, including the human body." Id.

the position as generally performed." (R. 2245.) On appeal, the Plaintiff evidently claims that this was error. (ECF No. 20-2, at 14) (urging reversal in part because his actual work as a case manager did not "correspond[] to the [DOT] definition").

To the extent that the Plaintiff's argument is a legal challenge to the ALJ's decision to use "generally performed" rather than "actually performed" as his reference point, it should be rejected because it contradicts established law. At Step Four, the Plaintiff "has the burden to show an inability to return to [his] previous specific job *and* an inability to perform [his] past relevant work generally." *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003) (emphasis in original) (citing *Jock v. Harris*, 651 F.2d 133, 135 (2d Cir. 1981)). Thus, an "ALJ's finding that Plaintiff could perform [his] past relevant work as generally performed is sufficient to negate a finding of disability at step four; it is not necessary for the Court to determine whether Plaintiff could perform [his] past relevant work as actually performed." *Albano v. Colvin*, 99 F. Supp. 3d 355, 368 (E.D.N.Y. 2015) (brackets, quotations, and citation omitted).

To the extent that the Plaintiff's challenge is instead a factual challenge to the ALJ's acceptance of VE Baruch's equation of "case manager" with "social worker," it is equally unpersuasive. The Plaintiff asserts that his "case manager" jobs "had little if anything to do with the occupation as described in the DOT" (ECF No. 20-2, at 17), but a reasonable mind could conclude otherwise based on the evidence in the record. In a 2018 "Work History Report" he described one past job as "provid[ing] counseling and other supports to a community of formerly homeless individuals coping with mental illness" (R. 321), and this would seem to fit comfortably within the DOT definition. *See* Dict. of Occupational Titles, 195.103-030 Social Worker, Medical (4th ed. 1991), 1991 WL 671574 (describing a "social worker – medical" as someone who "[a]ssists patients and their families with personal and environmental difficulties").

### 4.    *Step Five error*

Finally, the Plaintiff claims that the ALJ erred at Step Five in concluding that "there are other jobs that exist in significant numbers in the national economy that the claimant also can perform." (ECF No. 20-2, at 21; R. 2245.) He argues that this conclusion was mistaken in two respects, but the first – that the conclusion was based on an "unsupported hypothetical" – will be mooted if my Step Two recommendation is accepted and there is a new hypothetical at a new hearing. (ECF No. 20-2, at 21.) His second argument – that the ALJ's job incidence numbers "def[y] common sense and experience" (*id.*) – has yet to be discussed. If the District Judge reaches it, I recommend that it be rejected.

To recap the relevant hearing testimony, the ALJ posited to VE Baruch an "individual of the claimant's age, education and past relevant work experience who is limited to the sedentary exertion level" and who was further limited with respect to hazards, bending, lifting, fingering, and so forth. (R. 2287.) He then asked VE Baruch if there were "other jobs," aside from "case manager" "per DOT," that such a person could perform. (R. 2287-88.) The VE responded "[y]es," and added that such a person "could do the work of document preparer," for which "[t]here are 18,900 jobs in the USA." (R. 2288.) She also testified that this person could work as a "ticket checker," and that there were 7,000 such jobs in the national economy. She then testified that such a person could perform the job of "eyeglass polisher," and she stated that there were 1,950 eyeglass polisher jobs across the country. (*Id.*) She explained that she used a computer program called "Job Browser Pro" to develop these numbers. Attorney Shapiro cross-examined her, but his examination focused principally on the requirements of the various jobs and on the ability of different hypothetical persons to do them. (R. 2290-93.) He did not examine her about her job

incidence numbers (*id.*), nor did he raise any challenge to them in the note that he submitted after the hearing.  (R. 2252.)

In performing his Step Five analysis, the ALJ disagreed with VE Baruch – and in the Plaintiff's favor – on the ticket checker job.  (R. 2246, at n.4.)  He observed that that job "requires constant handling and fingering," and he concluded that this was beyond the Plaintiff's capabilities.  (*Id.*)  But he accepted the VE's testimony that the proffered hypothetical person could work as a "document preparer" or "eyeglass polisher," and he further accepted that there were 18,900 and 1,950 such jobs, respectively, available in the national economy.  (R. 2246.)

On appeal to this court, the Plaintiff argues that this last conclusion "defies common sense and experience."  (ECF No. 20-2, at 21.)  He notes that the DOT defines a "document preparer" as a person who "[p]repares documents, such as brochures, pamphlets, and catalogs *for microfilming*" (*id.*) (emphasis in original), and he says that "[a] reasonable mind would not accept" that there are 18,900 such workers in the United States.  (*Id.*)  He cites *Farias v. Colvin*, an unreported case in which a VE had testified, in substance, that there were 342,000 "head dance hall hostess" positions available in the national economy.  (*Id.*) (citing *Farias v. Colvin*, 519 F. App'x 439, 440 (9th Cir. 2013) (memorandum).

Courts have rejected similar challenges under analogous circumstances.  In *Bavaro v. Astrue*, for example, a VE testified that a significant number of "photo counter clerk" jobs existed in the national economy, but the claimant regarded the testimony as facially unreliable considering "the decline of the photofinishing industry."  413 F. App'x 382, 384 (2d Cir. 2011) (summary order).  The Second Circuit "decline[d] Bavaro's invitation to take judicial notice of" that decline, holding instead that where "[a] vocational expert testified to the existence of such jobs at the national and regional level," the ALJ was "entitled to credit that testimony" – at least where the

claimant offered only "conclusory proclamations to the contrary." *Id.* (citing 20 C.F.R. § 404.1566(e)). Similarly, in *Duprey v. Berryhill* a VE testified that there were 120,000 "addresser" jobs available, but the claimant protested that this was an "impossibility." No. 3:17-cv-607 (SALM), 2018 WL 1871451, at *11 (D. Conn. Apr. 19, 2018). Judge Merriam nonetheless declined to reverse on this ground, because "[t]he VE submitted his credentials, testified that his responses were consistent with the DOT, and answered all of the plaintiff's attorney's questions." *Id.* at *12. Under those circumstances, "the ALJ reasonably relied on the VE's expertise." *Id.*

Indeed, this court has previously rejected a virtually identical challenge to VE testimony on the very job at issue here. In *Jeffery Z. v. Kijakazi*, a VE testified that the plaintiff's limitations would not prevent him from working as a document preparer, and that there were 19,000 such jobs available nationwide. No. 3:21-cv-1458 (MPS) (TOF), 2023 WL 8115041, at *18 (D. Conn. Feb. 21, 2023), *report and recommendation adopted*, slip op. (D. Conn. Mar. 9, 2023). The plaintiff – who was represented by the same counsel as the Plaintiff in this case – argued that this figure "defie[d] common sense and experience," but the court declined to reverse the ALJ on that ground. *Id.* at *19. The court acknowledged decisions that, like *Farias*, expressed concern about "the growing obsolescence of certain DOT titles." *Id.* at *20 (citing *Zacharopoulos v. Saul*, 516 F. Supp. 3d 211, 221-22 (E.D.N.Y. 2021)). "Yet however dated it may be, the fact remains that administrative notice of the DOT is still expressly authorized by the Social Security regulations." *Id.* (citing 20 C.F.R. § 416.966(d)(1)). "Moreover, it is still the case that claimants ordinarily cannot obtain reversal or remand with mere 'conclusory proclamations' about the seeming obsolescence of the job titles upon which the VE relied." *Id.* (citing *Bavaro*, 413 F. App'x at 384).

In this case, as in *Bavaro*, the Plaintiff offers only conclusory assertions about the obsolescence of the "document preparer" job title. (ECF No. 20-2, at 21.) And in this case, as in

*Duprey*, the VE "submitted [her] credentials, testified that [her] responses were consistent with the DOT, and answered all of the plaintiff's attorney's questions." (R. 2510-11 (record copy of resume of VE Baruch, evidencing that she has been working in the vocational rehabilitation field since 1980); R. 2289-90 (stating that her testimony is consistent with the DOT); R. 2290-93 (answering every question asked by Attorney Shapiro)); *see also Duprey*, 2018 WL 1871451, at *11. It was reasonable for the ALJ to rely on the VE under those circumstances. *Id.*

## IV.    CONCLUSION

In closing, I will address the Plaintiff's alternative requests for relief. On the one hand, he asks for an order directing the Commissioner to allow and pay his SSDI and SSI claims. (Compl., ECF No. 1, at 4.) On the other hand, he asks "in the alternative that the matter be remanded to the defendant Commissioner for further proceedings in accordance with law." (*Id.*) To award the former type of relief, a District Court must find that the record contains "persuasive proof" of disability and "a remand for further evidentiary proceedings would serve no purpose." *Parker*, 626 F.2d at 235. A record contains "persuasive proof" of disability when there is "no apparent basis to conclude" that additional evidence "might support the Commissioner's decision." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1993). That is not the case here, and indeed the Plaintiff does not seriously contend otherwise. (*See generally* ECF No. 20-2) (failing to argue that the record contains persuasive proof of disability and that remand would serve no purpose).

For the reasons stated above, I recommend that the District Judge: (1) grant the Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 20) to the extent that it seeks vacation of the Commissioner's decision and remand for further administrative proceedings; (2) deny the Plaintiff's Motion to Reverse the Decision of the Commissioner to the extent that it seeks an order reversing and remanding solely for an award and calculation of benefits; (3) deny the

Commissioner's Motion to Affirm the Decision (ECF No. 21); and (4) order that the case be remanded to the Commissioner for further proceedings consistent with this opinion.

This is a recommended ruling by a United States Magistrate Judge.  *See* Fed. R. Civ. P. 72(b)(1).  Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen days of being served with it.  *See* Fed. R. Civ. P. 72(b)(2).  Failure to object within fourteen days will preclude appellate review.  *See* 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6€ of the Federal Rules of Civil Procedure; D. Conn. L. Civ. R. 72.2; *Impala v. United States Dep't of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (stating that failure to file timely objection to Magistrate Judge's recommended ruling will preclude further appeal to Second Circuit); *Small v. Sec'y of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (per curiam).


*/s/ Thomas O. Farrish*
_____
Hon. Thomas O. Farrish
United States Magistrate Judge
